## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

BIOMATRIX SPECIALTY PHARMACY,
LLC, FFP HOLDCO, LLC d/b/a MATRIX
HEALTH GROUP, BIOLOGICTX, LLC, and
FFP ACQUISITION II, LLC d/b/a MEDEX
BIOCARE,

               Plaintiffs,

               v.

HORIZON HEALTHCARE SERVICES, INC.
d/b/a HORIZON BLUE CROSS BLUE
SHIELD OF NEW JERSEY,

               Defendants.

CIVIL ACTION No.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs BioMatrix Specialty Pharmacy, LLC, FFP Holdco, LLC d/b/a Matrix Health Group, BiologicTx, LLC, and FFP Acquisition II, LLC d/b/a Medex BioCare (collectively, the "BioMatrix Plaintiffs" or "Plaintiffs"), by and through their undersigned attorneys, bring this Complaint against Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon"). In support of this Complaint, the BioMatrix Plaintiffs hereby allege as follows.

## I.     Statement of the Case

The BioMatrix Plaintiffs are specialty pharmaceutical companies that provide critical specialty drugs to treat significant medical conditions, including hemophilia. The Plaintiffs bring this action on their own behalves and, as described below, as the assignees of certain Horizon policy members (the "Members") who have assigned their claims against Horizon to the

BioMatrix Plaintiffs.   This is thus a direct action by the BioMatrix Plaintiffs and an action brought by the BioMatrix Plaintiffs based on the assignments by the Members.   As detailed in this Complaint, Horizon has undertaken a discriminatory strategy to evade its financial obligations to its most vulnerable Members by selectively refusing to pay for high-cost hemophilia medications and services, thereby depriving its Members of the very medication they need to survive.

Horizon's strategy was simple.   It issued a small group health insurance policy — the Horizon Direct Access Plan (the "Plan") — to an employer, Pacific Health Group, LLC ("Pacific Health Group"), for the Plan benefit year (October 1, 2016 – October 31, 2017).   The Plan explicitly provided its Members with coverage for medically necessary medications and services for hemophilia, a rare and debilitating blood disease requiring constant care and treatment through specialty drugs that companies like the BioMatrix Plaintiffs provide.   The Members expected that these benefits would be paid because Horizon collected and retained all of the premiums in exchange for such coverage at all times during the Plan benefit year (October 1, 2016 – October 31, 2017).   But contrary to its fiduciary obligations, Horizon arbitrarily denied the Members' highest cost claims for lifesaving medications, even though there was no legitimate dispute that such claims were for covered services.   Horizon only targeted the medically necessary claims of the Plan's Members who suffer from hemophilia.

By executing this strategy, Horizon failed to administer the Plan consistent with its terms and governing law.   In its initial denials of the claims for hemophilia treatment, Horizon informed its Members that the basis of the denials was that the "service is excluded from your benefit plan" — a demonstrably false statement.   The Plan states:

> Horizon BCBSNJ covers Medically Necessary and Appropriate home treatment services for bleeding episodes associated with

hemophilia including the purchase of blood products and blood infusion equipment.

(Certificate of Coverage, attached as Exhibit A to the Complaint.)  In April 2018, the Members timely appealed Horizon's denials.

Horizon never responded to the individual Member appeals.  Rather, it sent a single letter from its Special Investigations Unit's Chief Investigator, Scott Johnson, to Pacific Health Group, the Members' employer, asserting without any supporting evidence or documentation that Pacific Health Group was not a valid small group.  Horizon's adjudication of its Members' appeals willfully ignored the legal protections afforded its Members under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Plan's claims appeals procedures. In fact, Horizon's actions against its Members fell entirely outside of the acceptable claims appeals procedure.  It is evident that the goal of Horizon's actions — targeting vulnerable Members, denying these Members' claims in a baseless and arbitrary manner, and then stripping their ERISA-protected rights to appeal — was to limit its financial exposure at the expense of its Members suffering from hemophilia.

Horizon's interactions with the BioMatrix Plaintiffs are equally problematic.  During confirmations of coverage sought by the BioMatrix Plaintiffs, Horizon represented to the Plaintiffs that hemophilia treatment was a covered service under the Plan.  Horizon also executed 122 Letters of Agreement with the BioMatrix Plaintiffs, committing to pay for identical services for many of the same Members that are now the subject of the denials.  Relying upon Horizon's confirmation of hemophilia treatment as a covered service and the Letters of Agreement, the BioMatrix Plaintiffs dispensed hemophilia medications and rendered treatment to Horizon's Members.

Pursuant to assignments, the BioMatrix Plaintiffs submitted claims on behalf of the Members for hemophilia treatment.  Explanations of Benefits that Horizon issued to the BioMatrix Plaintiffs provided the following inconsistent and unsupportable reasons for the claims denials:

- The service is not paid.  Item or service denied by the special investigation unit.

- This service/equipment/drug is not covered under the patient's current benefit plan.

- This service is not paid.  This service is excluded from the Member's Benefit plan.

- Benefits for this service are excluded under this Member's plan.

- This drug/service/supply is not included in the fee schedule or contract/legislated fee arrangement.

The BioMatrix Plaintiffs timely appealed these seemingly random denials.  Recognizing that Horizon's prior denials were not supportable, Mr. Johnson from Horizon's Special Investigations Unit sent identical letters to the BioMatrix Plaintiffs on March 12, 2018, March 22, 2018, and June 6, 2018.  These letters abandon the prior basis asserted for the claims denials and assert, without any explanation or support, that Pacific Health Group was not a valid small group.  It remains unclear how Horizon believes that this assertion can excuse it from paying claims due under an insurance policy that is in full force and effect, and for which it is paying all claims other than for hemophilia drugs.

Despite Horizon's *post hoc* excuse (that the employer was not a valid small group) used to justify its denial of its Members' and the BioMatrix Plaintiffs' claims, at no time during the benefit year did Horizon rescind the Plan based upon this newly minted ground.  Rather, Horizon

collected and retained all of the Members' paid premiums during the Plan benefit year.  At the conclusion of the benefit year, Horizon unlawfully withheld a subset of its Members' benefits. Horizon then deprived its Members and the BioMatrix Plaintiffs of any meaningful claims appeals procedure, opting to summarily deny the appeals and failing to provide any justification for its claims denials or rationale for its conflicting explanations.

Horizon's actions violate the mandates of the Affordable Care Act, which governs the Plan at issue.  The Affordable Care Act includes specific provisions ensuring that small groups can obtain affordable coverage notwithstanding the medical history of the beneficiary population.  Under these provisions, it is flatly illegal for insurance companies like Horizon to target and discriminate against individuals suffering from debilitating conditions (such as hemophilia), as it has done here.

Notwithstanding that the BioMatrix Plaintiffs purchased and dispensed prescription drugs worth millions of dollars to the Members, Horizon has failed to pay at least $45 million dollars in billed charges to the BioMatrix Plaintiffs.  In so doing, Horizon has acted in direct contravention of the law, refusing to adhere to mandatory procedures under ERISA and associated Department of Labor regulations specifically designed to protect the Members.

As a fiduciary under ERISA, Horizon was required to discharge its duties with respect to the Plan *solely* in the interest of the participants, for the exclusive purpose of providing benefits to participants with care, skill, prudence, and diligence.  Horizon has violated its fiduciary duties, selectively denying its Members' coverage for medically necessary hemophilia treatment and refusing to reimburse the BioMatrix Plaintiffs for providing this treatment.   Horizon's discriminatory actions contravene both the letter and spirit of the Affordable Care Act, ERISA, the Americans with Disabilities Act, and state law.  For these reasons, the BioMatrix Plaintiffs

bring this action pursuant to ERISA and New Jersey and Florida state law to remedy Horizon's wrongful, arbitrary, and capricious denials on claims for medically necessary and covered services provided by the BioMatrix Plaintiffs to Horizon's Members and Horizon's administration of the Plan in direct contravention of its Members' interests and Federal law.

## II.    Jurisdiction And Venue

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  This Court also has jurisdiction under the Declaratory Judgement Act, 28 U.S.C. §§ 2201-02.

2.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiffs' claims under Florida and New Jersey statutory and common law.

3.      Horizon is subject to personal jurisdiction in this district because it resides, is found, or transacts its affairs in this District.  18 U.S.C. § 1965(a).

4.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within the Southern District of Florida.

## III.    The Parties

5.      Plaintiff BioMatrix Specialty Pharmacy, LLC ("BioMatrix") is a corporate entity organized under the laws of the State of Florida on July 17, 2015.  BioMatrix has a business address of 3300 Corporate Avenue, Suite 104, Weston, Florida.  BioMatrix wholly owns its subsidiaries, which are Plaintiffs FFP Holdco, LLC d/b/a Matrix Health Group, BiologicTx, and FFP Acquisition II, LLC d/b/a Medex BioCare.

6.      Plaintiff FFP Holdco, LLC d/b/a Matrix Health Group ("Matrix") is a corporate entity organized under the laws of the State of Florida, with a business address at 3300 Corporate Avenue, Suite 104, Weston, Florida.   Matrix operates a nationwide network of specialty pharmacies that provide medications to treat chronic health conditions, including hemophilia.

7.      Plaintiff FFP Acquisition II, LLC d/b/a Medex BioCare ("Medex") is a limited liability company organized under the laws of the State of Florida on August 4, 2011, with an address at 3300 Corporate Avenue, Suite 104, Weston, Florida.   Medex billed Horizon seeking reimbursement for the hemophilia-related services provided to its Members.   Medex operates a specialty pharmacy in Bartlett, Tennessee, that provides medication to treat chronic health conditions, including hemophilia.

8.      Plaintiff BiologicTx, LLC ("BiologicTx") is a limited liability company organized under the laws of the State of Nevada, with a business address of 40-D Commerce Way, Totowa, New Jersey.   Plaintiff BiologicTx operates a specialty pharmacy in Totowa, New Jersey, that focuses on providing medications to treat chronic health conditions, including hemophilia.

9.      Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon"), is a not-for-profit corporation organized under the laws of the State of New Jersey, with a principal place of business at 3 Penn Plaza, Newark, New Jersey.   At all times referred to herein, Horizon was authorized by the New Jersey Department of Banking and Insurance to issue health insurance policies.

**IV.     Standing and Ripeness**

10.      Plaintiffs Medex and BiologicTx assert claims in their individual capacity, plus as assignees of each of the individual Members for whom they provided specialty pharmacy

services.   Upon information and belief, each such Member executed an assignment to the respective specialty pharmacy of all of his or her rights and privileges under the Plan.

11.     The assignments permit Plaintiffs Medex and BiologicTx to pursue claims arising under State and Federal law, including claims arising under ERISA.[1]  (Services Rendered to Plan Members, attached as Exhibit B to this Complaint.)  Plaintiffs Medex and BiologicTx therefore have standing to assert claims on their own behalf, as well as on behalf of Horizon's Members.

12.     As detailed *infra*, Horizon's blanket denials of the Members' claims appeals render it impossible for Members to receive a full and complete review of the adverse benefit determinations in accordance with the Plan.   Accordingly, the Members are deemed to have exhausted all administrative remedies.

13.     Alternatively, any failure to exhaust administrative remedies must be excused on the basis of futility.

**V.     Factual Background**

**A.     Hemophilia Patient Care**

14.     "Hemophilia" refers to any defect in the biological process that allows blood to clot when a vessel or surrounding tissue is damaged.   Blood clotting (or coagulation) is a complex process that involves roughly a dozen different "clotting factors" that must combine in precise ways.   A defect in any of those factors can cause hemophilia.   Symptoms can range from mild to severe depending on the defective clotting factor at issue.

15.     The result is that treatment for hemophilia is highly individualized to each patient. It is incurable.   A patient must engage in lifelong disease management by administering specialty drugs that replace the missing clotting factor.   This process requires the patient to monitor

---

[1] Due to the confidential nature of certain medical information, the Plaintiffs will submit a Motion for Leave to File Exhibit B Under Seal.  As set forth more fully in the Motion, Exhibit B identifies the patients, dates of services rendered, and other pertinent information regarding each service provided to Horizon's Members.

clotting factor levels in their blood and adjust their own treatment.  *See* CTRS. FOR DISEASE CONTROL & PREVENTION, *Hemophilia: Facts (Treatment)* (Mar. 2, 2017), https://www.cdc.gov /ncbddd/hemophilia/facts.html.

16.     Because the disease requires regular monitoring, patients are responsible for their day-to-day care and typically have the best insight into which particular drugs or combinations work best for them.  *See* CTRS. FOR DISEASE CONTROL & PREVENTION, *Hemophilia: Facts (Treatment)* (Mar. 2, 2017), https://www.cdc.gov/ncbddd/hemophilia/facts.html.  Drug manufacturers and distributors thus sometimes retain representatives to interface directly with patients to obtain feedback and offer new product recommendations.

17.     Since hemophilia is typically diagnosed at a young age,[2] parents and other family members who have little or no experience must become caregivers for pediatric patients.  Such early onset of hemophilia places considerable burdens on family members, not only for newborns, but also throughout adolescence.

### B.     Plaintiffs' Services to the Hemophilia Community

18.     Hemophilia is a difficult-to-manage disease, both from the perspective of medical care and from the psychosocial effects of the disease.  Historically, hemophilia patients needed to be regularly tested and receive factor replacement therapy from their doctors.  Due to hemophilia's all-encompassing and disabling nature, hemophiliacs require a support system that includes a role for specialty pharmacies that fill prescriptions to treat hemophilia and a variety of other diseases.  Plaintiffs Medex and BiologicTx are such specialty pharmacies.

---

[2] According to the Centers for Disease Control and Prevention, the median age for diagnosis is 36 months for patients with mild hemophilia, 8 months for those with moderate hemophilia, and 1 month for those with severe hemophilia.  *See* CTRS. FOR DISEASE CONTROL & PREVENTION, *Hemophilia: Data & Statistics* (Apr. 12, 2017), https://www.cdc.gov/ncbddd/hemophilia/data.html.

19.     From a historical perspective, hemophilia patients have experienced difficulties in building networks of trusted caregivers.   During the 1980s, the AIDS epidemic resulted in widespread contamination of blood products designed to treat hemophilia.   The United States hemophilia population, at that time, was approximately 20,000 patients.   The impact of the contamination resulted in roughly 50% of the hemophilia population being killed from AIDS or Hepatitis C infections received from blood products.

20.     As a result, the hemophilia community became very close-knit, and trust became a central concern and challenge.   Patients desired to have a relationship with drug manufacturers and the medical professionals responsible for prescribing and administering their treatments.   In light of the historical challenges it was faced with, the hemophilia community places a high value on trust and personal relationships in the supply chain — a phenomenon that continues today.

21.     To foster trust, drug manufacturers and dispensaries have traditionally employed hemophilia patients or persons with direct connection to the hemophilia community.   Upon information and belief, some of the largest pharmaceutical manufacturers and dispensaries in the United States engage in the practice of employing individuals who themselves are diagnosed with hemophilia.   Examples of these entities include (i) Caremark Rx (n/k/a CVS Caremark), a prescription benefit management company; (ii) Accredo, the specialty pharmacy of Express Scripts; and (iii) Octapharma, a fully integrated manufacturer and supplier of plasma proteins.

22.     Small provider groups cannot offer the diversity of products or compete on the same scale as large pharmacy providers.   Rather, small provider groups typically focus on sales to individual patients as their primary market.   Patient relationships and patient trust drive this market.   Accordingly, the BioMatrix Plaintiffs contracted with an entity that provided a care

10

coordination force familiar with hemophilia.  This is a distinguishing and important factor for Plaintiffs in the individual patient market.

23.     Historically, due to the high costs of treatment, it was not uncommon for the subscriber of a hemophilia patient's insurance plan to have to change jobs frequently as plan caps were exhausted.  Employers (especially small ones) would sometimes terminate employees who had hemophilia in their families to avoid the high health care costs associated with hemophilia treatment.

24.     These abusive patient practices further compounded the hemophilia community's concerns related to trust.  Patients are often concerned with the following questions:  "How do I know my medication is safe?" and "How do I know my provider is acting in my best interest and isn't taking advantage of my medical condition?"

### C.     Formation and History of BioMatrix

25.     Against this complex backdrop, the Plaintiffs provide a tailored and widely accepted service to patients with hemophilia.  Matrix was founded in 2000 by Bruce Greenberg and continued to grow with the acquisition of BiologicTx in 2015.  Today, BioMatrix (as Matrix is known today) maintains a nationwide infrastructure to serve patients:  (i) BioMatrix operates 12 pharmacies nationwide, which are licensed in all 50 states; (ii) the BioMatrix pharmacies and related corporate entities employ 315 people in 18 states.  BioMatrix has three main business lines based on type of medication dispensed to its patients:  (i) Hemophilia; (ii) Intravenous Immunoglobulin Treatment ("IVIg"); and (iii) Other Specialty Conditions (including treatments for AIDS, hepatitis, infertility, etc.).  BioMatrix's pharmacies are diverse and provide services to patients suffering from a wide array of conditions including, but not limited to, hemophilia.

26.     BioMatrix's hemophilia or bleeding disorder program has positively impacted the lives of numerous hemophilia patients over the years.  Patients have seen less frequent bleeding episodes, reduced numbers of infusions, and fewer emergency room visits.  By pairing clinical expertise and peer-based social support, BioMatrix increases quality of life and reduces overall health care costs for its hemophilia patients.  BioMatrix uses a highly coordinated team to provide customized care for each patient through close monitoring and individualized support for treatment adherence.

27.     BioMatrix's IVIg program provides patients with comprehensive support services and coordinated delivery of IVIg treatment in the specialty areas of neurology, immunology, gastroenterology, as well as other specialty oral and injectable medications.  The largest portion of this business involves the provision of medications to patients used before and following organ transplants.  BioMatrix provides services that support the patient through every stage of their organ transplant, both before and after their new organ has been transplanted.

28.     Through its pre-transplant therapeutic interventions, combined with its post-transplant management of immunosuppressive medication regimens, BioMatrix ensures patient compliance and adherence.  BiologicTx's primary objective is to reduce antibodies, enabling patients to receive transplantation minimizing rejection, reduce overall health care expenditures by significantly reducing dialysis days and contribute to a reduction in mortality for patients who would otherwise die while waiting for a suitable organ transplant.

29.     BioMatrix also provides patients with services relating to other specialty conditions, including but not limited to treatments for AIDS, hepatitis, and infertility.  It has extensive business relationships within the industry, which benefit its patients.  These relationships include:

- 261 payor contracts across all pharmacies and lines of therapy; and

- Relationships with more than 120 organ transplant centers in connection with its IVIg line of therapy.

30.     While focused on the care and treatment of their patients, the BioMatrix pharmacies dispense 705,000 prescriptions and provide services to a total of 26,000 patients on an annual basis.  The vast majority of BioMatrix's business is distinct form hemophilia-related treatment.  Of the total prescriptions dispensed by BioMatrix, the hemophilia line of therapy accounts for 3,711 prescriptions and 471 patients.

31.     A measure of the value placed on BioMatrix's services by the hemophilia community is that it currently services 471 of the estimated 20,000 persons afflicted with hemophilia in the United States.

32.     Of the 471 BioMatrix hemophilia patients, fewer than 10% (approximately 34) are beneficiaries of the Horizon small group benefit plan at issue here.

33.     Hemophilia treatment overall (not limited to this small group) makes up approximately 35% of BioMatrix's overall revenue with only about 7–8% of the hemophilia revenue derived from the hemophilia patients covered by the Horizon small group benefit plan at issue here.  The claims at issue comprise only 2.4% of BioMatrix's overall revenue.

**D.     Pacific Health Group's Employee Health Plan**

34.     BioMatrix's sole business is the operation of specialty pharmacies.  Sales and care coordination function personnel that provide services to the BioMatrix pharmacy business are employed by an entity outside the BioMatrix family of companies.  Since 2012, the sales and care coordination functions have been outsourced pursuant to arm's length service contracts to

Pacific Health Group until 2016 when US Health Group and Atlantic Health Group began performing those services.

35.    The employees of Pacific Health Group support the pharmacies' hemophilia product line by providing a variety of services for hemophilia patients, including patient care coordination for the vulnerable population, as well as marketing of these services.  To effectively deliver these services, Pacific Health Group hired individuals who have experience with hemophilia, whether as care givers, advocates, or patients themselves.

36.    As a benefit of their employment, Pacific Health Group's employees were entitled to participate in an employer sponsored health benefits plan.  On September 30, 2016, Pacific Health Group sought health care coverage from Horizon for its employees and eligible family members.  (Application for a Small Group Health Benefits Policy, attached as Exhibit C to the Complaint.)

37.    In the application, Pacific Health Group provided a list of the number of its employees by work location and state.  The list stated that Pacific Health Group had employees that worked in the following states: California, Florida, Idaho, Indiana, Illinois, Maryland, Maine, Missouri, North Carolina, Nebraska, New Jersey, New Mexico, Nevada, Ohio, Pennsylvania, Tennessee, Texas, Virginia and Washington.  (*See* Exhibit C.)

38.    Horizon issued the Plan for Pacific Health Group with an effective date of October 1, 2016.  The Plan covered Pacific Health Group's 46 employees and their family members and dependents.  Each of these Members was issued a membership card, which could be presented to providers for medically necessary, covered services.  Horizon also provided the Pacific Health Group and its covered Members with a Certificate of Coverage as the operative Plan document.

39.     The Plan was a fully insured employee benefits plan governed by ERISA under which certain of Pacific Health Group's employees received health care coverage.  Moreover, with just 46 employees, the Plan was appropriately considered a small group health insurance plan and Horizon was required to comply with the small group mandates of the Patient Protection and Affordable Care Act ("Affordable Care Act").  *See* 42 U.S.C. § 300gg(a) (establishing factors that an insurer may consider in setting small group premiums); 45 C.F.R. § 147.102(a).

40.     In exchange for monthly premiums duly paid by Pacific Health Group and collected by Horizon during the entirety of the Plan benefit year, the Members were permitted to access medically necessary, covered services from physicians and specialty pharmacies.

41.     The services covered are defined under the Plan documents to include life sustaining treatment for hemophilia.  Under the Plan documents, Covered Charges are defined as:

> Allowed charges for the types of services and supplies described in the Covered Charges and Covered Charges with Special Limitations section of the Policy.  The services and supplies must be: a) furnished or ordered by a recognized health care Provider; and b) Medically Necessary and Appropriate to diagnose or treat an Illness or Injury.

(Exhibit A, p. 26.)

42.     The Plan documents further define "Medically Necessary and Appropriate" as:

> [A] service or supply is provided by a recognized health care Provider, and Horizon BCBSNJ determines at its Discretion, that it is: a) necessary for the symptoms and diagnosis or treatment of the condition, Illness or Injury; b) provided for the diagnosis,  or the direct care and treatment, of the condition, Illness or Injury; c) in accordance with generally accepted medical practice; d) not for the convenience of a Covered Person; e) the most appropriate level of medical care the Covered Person needs; and f) furnished within the

15

framework of generally accepted methods of medical management currently used in the United States.

(Exhibit A, p. 32.)

43.     An "Illness" is defined by the Plan documents as "a sickness or disease suffered by a Covered Person or a description of a Covered Person suffering from a sickness or disease."

(Exhibit A, p. 32.)

44.     Within the Covered Charges section of the policy, the Plan specifically provides for the treatment of hemophilia:

> **Blood**
> Unless otherwise provided in the **Charges for the Treatment of Hemophilia** section below, Horizon BCBSNJ covers blood, blood products, blood transfusions and the cost of testing and processing blood. . . .
>
> **Charges for the Treatment of Hemophilia**
> Horizon BCBSNJ covers Medically Necessary and Appropriate home treatment services for bleeding episodes associated with hemophilia including the purchase of blood products and blood infusion equipment.

(Exhibit A, p. 68.)

45.     There can be no question that hemophilia is an "Illness" within the meaning of the Plan documents, or that the Plaintiffs provided Medically Necessary and Appropriate hemophilia treatment within the scope of the Plan's definition of "Covered Charges."

46.     Thus, pursuant to the terms of the Plan, Pacific Health Group's covered Members and eligible dependents were permitted to access medically necessary, covered hemophilia treatments from specialty pharmacies.

47.     While the Plan was in effect, many of the Members selected BiologicTx and Medex to provide specialty pharmacy services to themselves or their covered dependents.

48.     BiologicTx and Medex were in-network specialty pharmacies that provided medically necessary and covered services to the Members.

49.     There have never been any requirements that Pacific Health Group employees utilize the BiologicTx or Medex pharmacies.  In fact, not all employees used the BiologicTx of Medex pharmacies to fulfill their hemophilia treatment needs.  Some Pacific Health Group employees and their covered dependents chose to use pharmacies other than those owned by the BioMatrix Plaintiffs.

### E.     Horizon's Discriminatory and Unfair Actions Against Its Members

50.     Contrary to its fiduciary obligations, in or about November 2017, Horizon began to deny the Members' highest cost claims for their medically necessary hemophilia medications and services.  Members received Explanation of Benefits stating that such medications and services were "excluded from your benefit plan."  (*See* Member Explanation of Benefits, attached as Exhibit D to the Complaint.)  This was a demonstrably false statement, as the Plan clearly covered Members' hemophilia treatment.  (*See* Exhibit A.)

51.     In April 2018, the Members submitted appeals seeking the Plan benefits they were due for these medically necessary, covered services.

52.     Horizon, by letter dated June 6, 2018 (the "June 6 Letter"), purported to deny the appeals of the Members. (June 6, 2018 Letter, attached as Exhibit E to the Complaint.)  The Horizon Special Investigations Unit's Chief Investigator claimed that:

> After investigation, Horizon-BCBSNJ determined that Pacific Health Group ("PHG") was not a valid group under N.J.A.C. 11:21-7.3, *et seq*.  PHG is not a bona fide small employer and is affiliated with the BioMatrix family of specialty pharmacies (BiologicTx, Matrix Health, Medex Biocare, and Factor Support Network.)

As previously discussed, we will be denying any pending claims as of November 13, 2017 and future claims submitted from Pacific Health Group ("PHG") due to PHG's misrepresentations and scheme to evade federal and state regulations relating to small employer groups.  PHG's scheme renders any claims submitted under its policy ineligible for reimbursement.

Based on this information, your recent appeals dated 4/25/18-4/27/18, are denied.

(Exhibit E.)

53.     The June 6 Letter did not provide the Members with the requisite regulatory appeal information, including but not limited to: (i) sufficient information relating to the adverse benefit determination, including "the date of service, the health care provider, the claim amount"; (ii) the diagnosis or treatment code used in adjudicating the adverse benefit determination and its corresponding meaning; (iii) the reasons for the adverse benefit determination, including a denial code and the applicable standard used to adjudicate the determination; (iv) a description of the Plan's internal appeals and external review processes, including information regarding how to initiate an appeal; and (v) the contact information for a "health insurance consumer assistance or ombudsman" to assist the Members in initiating appeals.  *See* § 147.136(b)(2)(E)(1)–(5) (enumerating notice requirements for adverse benefit determinations).  Nor was the June 6 Letter even sent to the individual Members, rather, the June 6 Letter was sent to the Pacific Health Group.  *See* § 147.136(b)(2)(E) (requiring Plan to provide notice to individuals).

54.     Moreover, the adjudication of appeals by Horizon's Special Investigations Unit further violated ERISA by circumventing the Plan's claims appeals procedure, as well as the appeals procedure outlined in applicable Department of Labor regulations.  *See* 29 C.F.R. § 2560.503-1 *et seq*.   ERISA's claims appeals procedures require, among other things, "administrative processes and safeguards designed to ensure and to verify that benefit claim

determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." *See id.* § 2560.503-1(b)(5).

55.     Horizon's use of the Special Investigations Unit to review the Members' appeals contravenes the spirit and letter of ERISA by presupposing an improper motive to the Members' appeals and depriving the Members' of a full and fair review as guaranteed by ERISA.

56.     At all times, Horizon failed to comply with the claims appeals procedure guaranteed to the Members by ERISA.  Horizon's noncompliance with these procedures, as well as the lack of any justifiable explanation for its improper denials of Members' appeals for their hemophilia medications and services, suggest that Horizon's actions were not only arbitrary and capricious, but also discriminatory.

**F.     Horizon's Denial of Provider Appeals**

57.     At the commencement of the Plan's coverage period in October 2016, Horizon initially reimbursed all claims submitted by the BioMatrix Plaintiffs — about $30 million — for the Members' medically necessary and covered hemophilia medications and services.  Plaintiffs received payment for these medications and services pursuant to Horizon's confirmation that such services were covered services under the Plan.

58.     Horizon continued to reimburse the Plaintiffs for these claims through early November 2017.  In fact, between February 2017 through November 2017, Horizon entered into 122 "Letters of Agreement," in which it agreed to reimburse Plaintiffs for the Members' medically necessary and covered medications and services.  The Letters of Agreement further state that Horizon will issue the payment directly to the respective pharmacy that rendered services and medications to the Member.

59.     The Letters of Agreement entered into by Horizon and the Plaintiffs stated, among other things, that Horizon would reimburse for services and medications provided by Plaintiffs Medex or BiologicTx "based on the parties' negotiated charge."  The Letters of Agreement further state:

> Reimbursement will be processed in accordance with Horizon BCBSNJ's claims processing guidelines, with Horizon BCBSNJ's portion of the payment issued directly to [the specialty pharmacy.] . . . Moreover, Horizon shall adjudicate all claims pursuant to the terms and conditions outlined in Horizon policies (i.e. Horizon Claims Reimbursement Methodology and Claims Adjudication).

(Letter of Agreement, attached as Exhibit F to the Complaint.)

60.     Pursuant to assignments, the BioMatrix Plaintiffs submitted claims on behalf of the Members for hemophilia treatment.

61.     On or about November 13, 2017, Horizon began denying claims submitted by Plaintiffs for medication and services rendered to the Members.  Horizon provided the following inconsistent and unsupportable reasons for the claims denials:

- The service is not paid.  Item or service denied by the special investigation unit.

- This service/equipment/drug is not covered under the patient's current benefit plan.

- This service is not paid.  This service is excluded from the Member's Benefit plan.

- Benefits for this service are excluded under this Member's plan.

- This drug/service/supply is not included in the fee schedule or contract/legislated fee arrangement.

62.     Horizon denied claims for these medications and services, despite the Plan's Certificate of Coverage express coverage for hemophilia treatment.  (Exhibit A, p. 68.)  Horizon acknowledged this coverage by initially reimbursing Plaintiffs about $30 million, consistent with Letters of Agreement dated as late as November 14, 2017, merely one day after Horizon's arbitrary decision to begin denying these claims.

63.     At all times, the Plaintiffs purchased hemophilia medications and services and filled valid prescriptions for the Members' medically necessary hemophilia medications.  The Plaintiffs purchased these medications from the manufacturers or third party distributors.

64.     Prior to dispensing these medications to Horizon's Members, the Plaintiffs sought confirmation from Horizon that these medications and services were covered services under the Plan.  During these confirmations of coverage, Horizon represented to Medex and BiologicTx that no authorizations for these medications and services were necessary.   As further confirmation that no preauthorizations were necessary, Plaintiff BiologicTx nevertheless submitted preauthorization requests to Horizon for these hemophilia medications and services before providing care to the Members.  Horizon responded:

> No authorization is required based on the procedure and place of service requested.  However, services are still subject to Horizon's Medical Policy.  . . .  If the criteria is not met, the claim for such services may be denied for lack of medical necessity.

(Coverage Confirmations, dated October 26, 2016 and February 1, 2017, attached as Exhibit G to the Complaint).

65.     In subsequent preauthorization requests submitted by BiologicTx, Horizon further stated:

> Provider is advised IV factor medications [n]o auth required even if done in home[] for any IV Factor medications due to the urgency these members must receive the IV medication.  No authorization

> is required based on the procedure and place of service requested. However, services are still subject to Horizon's Medical Policy. . . If the criteria is not met, the claim for such services may be denied for lack of medical necessity.

(*See* Exhibit G).

66.     Accordingly, Horizon represented to Plaintiffs that the hemophilia medications dispensed to the Members were covered services subject to medical necessity guidelines.  There is no question that the Plaintiffs provided authorized medically necessary services to the Members.

67.     Since Horizon began summarily denying the Plaintiffs' direct claims for payment, the Plaintiffs have appealed, and continue to appeal, Horizon's claims denials pursuant to the Plan's appeals process.

68.     The Horizon Ancillary Provider Office Manual sets forth the applicable internal appeals process for the Plaintiffs' provider appeals.  (Horizon Ancillary Provider Office Manual, attached as Exhibit H to the Complaint.)  The Manual states:

> If an unfavorable determination is made for the ancillary provider, the health insurer must provide the ancillary provider instructions for referral to external arbitration.  If the ancillary provider is not timely notified of the determination, or disagrees with the final decision, the ancillary provider may refer the dispute to external arbitration.

(*See* Exhibit H, p. 50.)

69.     In response to the Plaintiffs' appeals, Horizon's Special Investigations Unit has issued blanket denials to the Plaintiffs.  (March 12, 2018, March 22, 2018 and June 6, 2018 Letters, attached as Exhibit I to the Complaint.)

70.     In these letters, Horizon's Senior Investigator, Scott Johnson, states:

> After investigation, Horizon-BCBSNJ determined that Pacific Health Group ("PHG") was not a valid group under N.J.A.C.

22

> 11:21-7.3 *et seq*. . . . PHG is not a bona fide small employer and is affiliated with the BioMatrix family of specialty pharmacies (BiologicTx, Matrix Health, Medex Biocare, and Factor Support Network).
>
> As we previously advised you, as of November 13, 2017, any pending and future claims from the BioMatrix family of providers for members of this small group are not eligible for reimbursement and will be denied.

(*See* Exhibit I.)

71.     The March 12, 2018 and March 22, 2018 Letters do not provide any further details or reasons for the denial of the Plaintiffs' claims.  Despite the Plaintiffs' attempts to adhere to the Plan's appeals process, Horizon has continued to deny the Plaintiffs of any meaningful appeals process by issuing these letters and refusing to engage in further discussions as to the reasons for the denials.

72.     Moreover, in violation of the Ancillary Provider Office Manual, Horizon has failed to provide any details as to the Plaintiffs' right to pursue this dispute through an external appeals process.

73.     Horizon's arbitrary and capricious denials of the Plaintiffs' direct and assigned claims, the lack of any justifiable explanation for such denials and its noncompliant appeals process have deprived the Plaintiffs of their rights to receive reimbursements for valuable, covered and medically necessary medications and services provided to the Members.

74.     Due to Horizon's blanket denials of claims for its Members' treatment and the high cost of hemophilia treatment, the Plaintiffs have suffered and will continue to suffer business losses.

75.    At all times, Horizon acted arbitrarily and capriciously in denying the Plaintiffs' claims for medically necessary hemophilia medications and services, and in adjudicating the Plaintiffs' and Members' appeals.

76.    At all times, the Plan was a fully insured health insurance plan governed by ERISA.  Horizon, as Plan administrator, was responsible for the dual roles of rendering benefit determinations and paying claims.   As alleged above, Horizon acted with the requisite self-interest and self-motivation so as to constitute a conflict of interest under ERISA.

**G.    Horizon's Actions Violate Federal Law**

77.    As a fiduciary under ERISA, Horizon is required to discharge its duties with respect to the Plan solely in the interest of the participants for the exclusive purpose of providing benefits to participants "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," pursuant to ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).   Horizon also was required to comply with all applicable rules and regulations, including the Affordable Care Act.

78.    Horizon has violated Section 1557 of the Affordable Care Act, which prohibits exclusion of individuals from participation in a health program on the basis of discrimination. That provision states, in pertinent part:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under ... section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).  The enforcement mechanisms provided for and

> available under such title VI, title IX, section 504, or such Age
> Discrimination Act shall apply for purposes of violations of this
> subsection.

42 U.S.C.A. § 18116(a).

Horizon violated Section 1557 of the Affordable Care Act by intentionally seeking to avoid its financial obligation to pay for medically necessary and covered hemophilia treatment, thereby discriminating against Members because they were hemophiliacs.

79.     As a fiduciary under ERISA, Horizon also was required to comply with all applicable rules and regulations, including the Americans with Disabilities Act ("ADA").  The ADA prohibits discrimination on the basis of a qualified individual's disability in, among other things, the terms and conditions of employment, including employee benefits, as set forth in 42 U.S.C. § 12111, *et seq.*  The Members with hemophilia are Qualified Individuals who suffer from a Disability as defined under 42 U.S.C. §§ 12102(1), 12111(8).

80.     As the administrator of an employee benefit plan for an employer with 15 or more employees, Horizon is an agent for an Employer under the ADA, as defined under 42 U.S.C. § 12111(5) and is required to comply with the ADA.  By denying the Plaintiffs' claims for hemophilia treatment, Horizon breached its fiduciary duty to act with the requisite care, skill, prudence and diligence required of an ERISA fiduciary.

81.     Horizon has failed to abide by the procedural and notice requirements imposed by the statute and its implementing regulations.  ERISA § 503(1), 29 U.S.C. § 1133(1) requires that every employee benefit plan provide adequate written notice to any participant or beneficiary whose claim has been denied or reduced, including specific reasons for the denial or reduction. Horizon, as the Plan administrator, was required to deny or pay a claim or appeal of a claim, or otherwise provide an initial advance determination with regard to a claim or adverse benefit

determination with regard to an appeal, within 30 days of receipt for post-service claims under 29 C.F.R. § 2560.503-1.

82.     Pursuant to the Regulation, within 30 days of the receipt of a claim, the plan or claim administrator of a group health plan must either pay the claim, deny the claim, or request information or a 15-day extension of time.  Thus, if Horizon had any issues with the claims submitted by the Plaintiffs, it was required to review or investigate the claims within the confines of the Regulation's time period, i.e., within 30 days of the receiving the claims or within a 15-day extension period.

83.     Horizon failed to render its benefit determinations within the time periods set forth above, often taking upwards of 60 days to adjudicate these claims.  Then, after reimbursing approximately $30 million in valid claims, Horizon stopped paying claims altogether.

84.     As noted above, Horizon has thwarted any attempts by the Plaintiffs to engage in the Plan's appeals process.  Rather than provide a substantive basis for Horizon's denials, the Plaintiffs have received letters providing little detail of Horizon's justifications for the claim denials.  This lack of adequate written notice for Horizon's denials are in violation of ERISA's applicable regulations.

**H.     The Impact of Horizon's Improper Claims Denials on Plaintiffs**

85.     Horizon's actions have specifically injured the Plaintiffs' business.  Horizon's baseless and arbitrary claims denials and unilateral actions have damaged the Plaintiffs' reputation in the market.  As noted above, the Plaintiffs' business is predicated on the trust it has earned in the hemophilia community.  Horizon's failure to pay for the valuable services provided by the Plaintiffs seeks to sever the Plaintiffs' carefully built relationship with the hemophilia community and threatens the very nature of their business.

86.     In addition, Horizon's actions adversely impacted the Plaintiffs' business relationships.  Business partners have either decided not to do business with the Plaintiffs or reduced their relationships.  This has substantially affected the Plaintiffs' potential revenue streams.

87.     As a direct result of Horizon's actions, the Plaintiffs' revenue has decreased.

88.     At the same time, the Plaintiffs' operational costs have increased.  The Plaintiffs have incurred increased borrowing costs due to Horizon's wrongful withholding of claims payment due to the Plaintiffs.

89.     While the impact these costs have on the Plaintiffs' business is serious, they are compounded by the lasting damage to the Members, whose claims are being brought by the Plaintiffs pursuant to valid assignments.

90.     Horizon's actions have caused and continue to cause significant damages to the Plaintiffs.  Claims for pharmaceutical products have gone unpaid, recoupments are threatening to result in a major cash shortage endangering the financial viability of the Plaintiffs' business, other companies in the market have questioned the impact of the Horizon's actions on the Plaintiffs' ability to continue to supply products, and the Plaintiffs are losing — and are in danger of further losing — business opportunities.

91.     The precise amount of all damages will be established at trial, but it will exceed many millions of dollars.

## COUNT I

### VIOLATION OF 29 U.S.C. § 1132(a)(1)(B)
(Medex and BiologicTx v. Horizon)

92.     Plaintiffs Medex and BiologicTx re-allege and incorporate as though fully set forth herein the allegations contained in paragraphs 1 through 91 of the Complaint.

93.     As the Plan administrator and as a Plan fiduciary because it retained discretion in interpreting the terms of the Plan, Horizon must cover and pay benefits to fully insured Members in accordance to the terms of the Plan, and in accordance with ERISA.

94.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant or its assignee to bring a civil action to recover benefits due under the terms of the plan, to enforce the participants' rights under the terms of a plan, and/or to clarify the participants' rights under the terms of a plan.

95.     Plaintiffs Medex and BiologicTx have standing to pursue these claims as assignees of the Members' rights and privileges under their Plan, pursuant to assignments Plaintiffs Medex and BiologicTx received from patients who were Members.

96.     Horizon violated its legal obligations under the ERISA-governed plans when it refused to reimburse its Members' covered services billed to it as alleged in this Complaint, in violation of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

97.     Pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), Plaintiffs Medex and BiologicTx are entitled to recovery for unpaid benefits and declaratory relief relating to Horizon's violations of the terms of its Plan.

## COUNT II

**VIOLATION OF 29 U.S.C. § 1104**
**ERISA Breach Of Fiduciary Duty Based Upon Violations Of The**
**ERISA's Claims Procedures Regulations**
(Medex and BiologicTx v. Horizon)

98.     Plaintiffs Medex and BiologicTx re-allege and incorporate as though fully set forth herein the allegations contained in paragraphs 1 through 91 of the Complaint.

99.     Horizon is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it retained and exercised control over the management and administration of the Plan.

100.    As a fiduciary under ERISA, Horizon was required to discharge its duties with respect to the Plan solely in the interest of the participants, for the exclusive purpose of providing benefits to participants and fiduciaries "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," pursuant to ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

101.    As a fiduciary under ERISA, Horizon was required to comply with all applicable rules and regulations in its management and administration of the Plan.

102.    ERISA § 503(1), 29 U.S.C. § 1133(1), requires that every employee benefit plan provide adequate written notice to any participant or beneficiary whose claim has been denied or reduced, including specific reasons for the denial or reduction.

103.    As the Plan administrator, Horizon is required to deny or pay a claim or appeal of a claim, or otherwise provide an initial advance determination with regard to a claim or adverse benefit determination with regard to an appeal, within 30 days of receipt for post-service claims under 29 C.F.R. § 2560.503-1 (the "Regulation").

104.    The Regulation provides:

> In the case of a group health plan, the plan administrator shall notify a claimant of the plan's benefit determination in accordance with paragraph (f)(2)(i), (f)(2)(ii), or (f)(2)(iii) of this section, as appropriate.
>
> . . .
>
> (B) Post-service claims. In the case of a post-service claim, the plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the plan's adverse benefit determination within a reasonable period of time, but not later than 30 days after receipt of the claim. This period may be extended one time by the plan for up to 15 days, provided that the plan administrator both determines that such an extension is necessary

due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 30-day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision. If such an extension is necessary due to a failure of the claimant to submit the information necessary to decide the claim, the notice of extension shall specifically describe the required information, and the claimant shall be afforded at least 45 days from receipt of the notice within which to provide the specified information.

29 C.F.R. § 2560.503-1.

105.    Pursuant to the Regulation, within 30 days of the receipt of a claim, the plan or claim administrator of a group health plan must either pay the claim, deny the claim, or request information or a 15-day extension of time.

106.    Thus, if Horizon had any issues with the claims submitted by the Plaintiffs, it was required to review or investigate the claims within the confines of the Regulation's time period, i.e., within 30 days of the receiving the claims or within a 15-day extension period.

107.    Horizon failed to render its benefit determinations within the time periods set forth above, often taking upwards of 60 days to render such determinations.

108.    By failing to adjudicate the claims in a timely manner, Horizon deprived its Members of the ability to appeal the benefit determination and exhaust their administrative remedies, as guaranteed by ERISA.

109.    Moreover, Horizon has failed to comply with ERISA's requirements of adequate written notice, as it has denied over $45 million in claims without providing specific reasons for the denial of the claims after initially reimbursing the claims in full.

110.    Horizon has violated an applicable federal law and in doing so, has breached its fiduciary duty to act with the requisite care, skill, prudence, and diligence required of an ERISA fiduciary.

111.    Horizon's breach of its fiduciary duty was the direct, actual, and proximate cause of significant damages suffered by Plaintiffs.

112.    Plaintiffs are entitled to assert a claim for relief against Horizon as a result of Horizon's violations of its fiduciary duties under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including declaratory relief.

## COUNT III

**VIOLATION OF 29 U.S.C. § 1104**
**ERISA Breach Of Fiduciary Duty Based Upon Violations Of The**
**Patient Protection And Affordable Care Act's Non-Discriminatory Provision**
(Medex and BiologicTx v. Horizon)

113.    Plaintiffs Medex and BiologicTx re-allege and incorporate as though fully set forth herein the allegations contained in paragraphs 1 through 91 of the Complaint.

114.    Horizon is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it has retained and exercised control over the management and administration of the Plan.

115.    As a fiduciary under ERISA, Horizon was required to discharge its duties with respect to the Plan solely in the interest of the participants, for the exclusive purpose of providing benefits to participants and fiduciaries "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," pursuant to ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

116.    Plaintiffs Medex and BiologicTx have standing to pursue these claims as assignees of their patients' rights and privileges under their Plan, pursuant to assignments the Plaintiffs received from patients who were Members.

117.    As a fiduciary under ERISA, Horizon was required to comply with all applicable rules and regulations, including the Affordable Care Act.  The Affordable Care Act was incorporated into ERISA by amendment, as set forth in ERISA § 715(a)(1)(B), 29 U.S.C. § 1185(d) and applies to the Plan at issue.

118.    Section 1557 of the Affordable Care Act states, in pertinent part:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under ... section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 504, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C.A. § 18116(a).

119.    Horizon is an entity engaged in the provision of a "health program or activity" under the Affordable Care Act, and is required to comply with the Affordable Care Act's non-discriminatory provision.

120.    Hemophilia is a chronic disease that requires regular and frequent testing, factor replacement therapy and medicine, thus affecting a patient's major life activities.  Accordingly, persons with hemophilia have a "disability" within the meaning of Section 504 of the Rehabilitation Act of 1973.

121.    By denying the Plaintiffs' claims for hemophilia treatment, Horizon has violated Section 1557 of the Affordable Care Act by intentionally discriminating against Members on the basis of their disability.

122.    Horizon has violated an applicable federal law and in doing so, has breached its fiduciary duty to act with the requisite care, skill, prudence, and diligence required of an ERISA fiduciary.

123.    Horizon's breach of its fiduciary duty was the direct, actual, and proximate cause of significant damages suffered by the Plaintiffs.

124.    Plaintiffs Medex and BiologicTx are entitled to assert a claim for relief against Horizon as a result of Horizon's violations of its fiduciary duties under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including declaratory relief.

## COUNT IV

**VIOLATION OF 29 U.S.C. § 1104**
**ERISA Breach Of Fiduciary Duty Based Upon Violations Of The**
**Americans with Disabilities Act**
(Medex and BiologicTx v. Horizon)

125.    Plaintiffs Medex and BiologicTx re-allege and incorporate as though fully set forth herein the allegations contained in paragraphs 1 through 91 of the Complaint.

126.    Horizon is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it has retained and exercised control over the management and administration of the Plan.

127.    As a fiduciary under ERISA, Horizon was required to discharge its duties with respect to the Plan solely in the interest of the participants, for the exclusive purpose of providing benefits to participants and fiduciaries "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," pursuant to ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

128.     Plaintiffs Medex and BiologicTx have standing to pursue these claims as assignees of their patients' rights and privileges under their Plan, pursuant to assignments the Plaintiffs received from patients who were Members.

129.     As a fiduciary under ERISA, Horizon was required to comply with all applicable rules and regulations, including the Americans with Disabilities Act ("ADA").

130.     The ADA prohibits discrimination on the basis of a qualified individual's disability in, *inter alia*, the terms and conditions of employment, including employee benefits, as set forth in 42 U.S.C. § 12111, *et seq.*

131.     The Members with hemophilia are Qualified Individuals who suffer from a Disability as defined under 42 U.S.C. §§ 12102(1), 12111(8).

132.     As the administrator of an employee benefit plan for an employer with 15 or more employees, Horizon is an agent for an Employer under the ADA, as defined under 42 U.S.C. § 12111(5) and is required to comply with the ADA.

133.     Horizon has violated the ADA by discriminating against Members on the basis of their disability and denying the Plaintiffs' claims for hemophilia treatment.

134.     Horizon has violated an applicable federal law and in doing so, has breached its fiduciary duty to act with the requisite care, skill, prudence, and diligence required of an ERISA fiduciary.

135.     Horizon's breach of its fiduciary duty was the direct, actual, and proximate cause of significant damages suffered by Plaintiffs Medex and BiologicTx.

136.     Plaintiffs Medex and BiologicTx are entitled to assert a claim for relief against Horizon as a result of Horizon's violations of its fiduciary duties under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including declaratory relief.

## COUNT V

**VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT**
(All Plaintiffs v. Horizon)

137.    The Plaintiffs re-allege and incorporate as though fully set forth herein the allegations contained in paragraphs 1 through 91 of the Complaint.

138.    Horizon's refusal to pay claims for treatment rendered by the Plaintiffs to Horizon's Members constitutes violations of the New Jersey Consumer Fraud Act, (N.J.S.A. § 56:8-2 *et seq.*), in that Horizon materially misrepresented its intent to reimburse the Plaintiffs for the valuable, covered and medically necessary services it provided to Horizon's Members.

139.    Horizon's Certificate of Coverage expressly provides coverage for hemophilia treatment.  Until November 2017, Horizon reimbursed the Plaintiffs for the hemophilia treatment provided to Horizon's Members.  Now, despite its written representations — including the Certificate of Coverage, coverage confirmations and Letters of Agreement — and prior payments, Horizon has denied the Plaintiffs' claims for reimbursement because such treatment is allegedly excluded under the Plan.

140.    The Plaintiffs, in accordance with the Plan's appeal procedures, have appealed these claim denials.  Horizon, through its Senior Investigator of the Special Investigations Unit, Scott Johnson, has issued blanket denials of the Plaintiffs' appeals and has failed to provide any reasonable justification or specific details for the denials of these claims.

141.    Horizon has acted with the intent to deprive the Plaintiffs of reimbursements that represent the value of the covered and medically necessary medications and services provided to Horizon's members.

142.    Horizon's refusals to pay for such medically necessary treatment and to afford the Plaintiffs a meaningful opportunity to appeal its claims denials pursuant to the Plan's appeals

procedures constitute unconscionable commercial practices in violation of the New Jersey Consumer Fraud Act (N.J.S.A. § 56:8-2 *et seq.*).

143.    The Plaintiffs have suffered an ascertainable loss of at least $45 million in billed charges.  The Plaintiffs will suffer more losses as Horizon continues to summarily deny its claims for reimbursement.

144.    Horizon's refusal to pay these claims is the direct cause of the Plaintiffs' losses.

## COUNT VI

**PROMISSORY ESTOPPEL UNDER NEW JERSEY COMMON LAW**
(BiologicTx v. Horizon)

145.    Plaintiff BiologicTx re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 91 of the Complaint.

146.    The Plan prepared by Horizon provides for reimbursement of claims for hemophilia treatment.  Horizon initially reimbursed Plaintiff BiologicTx for its submitted claims for valuable, covered, and medically necessary hemophilia treatment and entered into Letters of Agreement for the reimbursement of other claims.  Moreover, Plaintiff BiologicTx received coverage confirmations from Horizon, stating the Plan covered the Members' medically necessary hemophilia treatment.

147.    These initial reimbursements, Letters of Agreement, and coverage confirmations constituted clear and definite promises for payment going forward, and were made with the expectation that Plaintiff BiologicTx would rely on such a promise for payment.

148.    Plaintiff BiologicTx justifiably and reasonably relied on Horizon's prior actions and representations that it would fully reimburse for the Members' hemophilia treatment.

36

149.     After initially reimbursing Plaintiff BiologicTx's claims for hemophilia treatment, Horizon stopped reimbursing these claims despite the fact that Plaintiff BiologicTx continued to provide medically necessary medications and services to the Members.

150.     As a result of Horizon's actions, Plaintiff BiologicTx has suffered harm caused by its reliance on the promises by Horizon, and such harm will continue if Horizon's promises are not fully enforced.

## COUNT VII

### TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE UNDER NEW JERSEY COMMON LAW
(BiologicTx v. Horizon)

151.     Plaintiff BiologicTx re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 91 of the Complaint.

152.     The Plan prepared by Horizon provides for reimbursement of claims for hemophilia treatment.  Horizon initially reimbursed Plaintiff BiologicTx for its submitted claims for valuable, covered, and medically necessary hemophilia treatment and entered into Letters of Agreement for the reimbursement of other claims.  Moreover, Plaintiff BiologicTx received coverage confirmations from Horizon, stating the Plan covered the Members' medically necessary hemophilia treatment.  Thus, Plaintiff BiologicTx reasonably expected to receive reimbursement from Horizon for providing valuable, covered, and medically necessary medications and services to Horizon's Members.

153.     Horizon has intentionally and maliciously interfered with Plaintiff BiologicTx's expected payments by refusing to reimburse its claims for the services provided to its hemophilia patients.

154.     Horizon's actions are tortious, improper, and without justification.

155.     Horizon's unjustified actions have caused Plaintiff BiologicTx to lose significant reimbursement payments.

156.     As a result of Horizon's actions, Plaintiff BiologicTx has suffered and will continue to suffer damages.

## COUNT VIII

### IMPLIED-IN-LAW CONTRACT/UNJUST ENRICHMENT UNDER NEW JERSEY COMMON LAW
(BiologicTx v. Horizon)

157.     Plaintiff BiologicTx re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 91 of the Complaint.

158.     Plaintiff BiologicTx conferred direct benefits upon Horizon by providing valuable, covered, and medically necessary hemophilia treatment to Horizon's Members through their established course of dealing as the party responsible for payment for this treatment.

159.     Horizon appreciated this direct benefit from Plaintiff BiologicTx's provision of the hemophilia treatment for its participants because Plaintiff BiologicTx provided the treatment at its own expense.  As a result of Plaintiff BiologicTx's provision of treatment, Horizon fulfilled its obligations to the Members who pay premiums.

160.     Horizon voluntarily accepted, retained and enjoyed the benefits conferred by Plaintiff BiologicTx, at Plaintiff BiologicTx's expense, with the knowledge that Plaintiff BiologicTx expected to be paid the value of its services.

161.     Horizon failed to pay the value of Plaintiff BiologicTx's health care services. From November 2017 until the present, Horizon has denied Plaintiff BiologicTx's submitted claims for hemophilia treatment.

162.    Horizon has retained the funds it would have otherwise reimbursed the Plaintiff BiologicTx.

163.    By failing to reimburse Plaintiff BiologicTx for the treatment it rendered to Horizon's Members, Horizon has been unjustly enriched.

## COUNT IX

**NEGLIGENT MISREPRESENTATION UNDER NEW JERSEY COMMON LAW**
(BiologicTx v. Horizon)

164.    Plaintiff BiologicTx re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 91 of the Complaint.

165.    Despite the Plan's coverage of hemophilia treatment, prior reimbursements, Letters of Agreement and Plaintiff BiologicTx's receipt of coverage confirmations stating such medications and services were covered under the Plan, Horizon now refuses to pay claims appropriately in accordance with the Plan documents and other representations it has made.

166.    Horizon's misrepresentation of coverage for medications and services was unknown to Plaintiff BiologicTx at the time it agreed to provide medications and services to the Members.

167.    At all times, Horizon, as the Plan fiduciary, owed a duty to its Members and providers dispensing hemophilia treatment to its Members, to administer the Plan in accordance with the Plan documents and other representations it has made.  Moreover, Horizon and its agents, employees, and representatives owe a duty to providers like Plaintiff BiologicTx to reasonably and adequately investigate, maintain and convey to providers accurate information relating to plan coverage, benefits and exclusions under the insurance policies they issue. Horizon specifically owed this duty to Plaintiff BiologicTx, who contacted Horizon seeking

confirmation of coverage for the hemophilia medication and services it provided the Plan members.

168.    Plaintiff BiologicTx reasonably expected and relied upon what it believed to be Horizon's honest representations that the hemophilia medications and services were covered under the Plan and Plaintiff BiologicTx would be properly compensated in accordance with the Plan.

169.    By making such misrepresentations, Horizon breached its fiduciary duty to administer the Plan in accordance with the Plan documents and other representations it has made. It further breached its duty by failing to adequately investigate, maintain and convey to Plaintiff BiologicTx accurate information relating to the Plan's coverage.

170.    Plaintiff BiologicTx's reliance on these misrepresentations were to its substantial detriment and as a result, Plaintiff BiologicTx has been harmed and will continue to be harmed by Horizon's actions.

## <u>COUNT X</u>

**VIOLATIONS OF THE FLORIDA DECEPTIVE AND
UNFAIR TRADE PRACTICES ACT**
(Medex and BioMatrix v. Horizon)

171.    Plaintiffs Medex and BioMatrix re-allege and incorporate as though fully set forth herein the allegations contained in paragraphs 1 through 91 of the Complaint.

172.    Horizon's refusal to pay claims for treatment rendered by the Plaintiffs to Horizon's Members constitutes deceptive and unfair trade practices under the Florida Deceptive and Unfair Trade Practices Act, (F.S.A. § 501.201 *et seq*.), in that Horizon placed the maximization of their profits over the reimbursement of hemophilia treatment for the Members.

173.   The public is likely to be substantially damaged as a result of Horizon's deceptive and unfair trade practices.

174.   Such unfair trade practices are immoral, unethical, oppressive, unscrupulous and offend established public policy.

175.   Plaintiffs Medex and BioMatrix have suffered actual damages as a direct and proximate result of Horizon's wrongful, deceptive, and unfair trade practices.

176.   As a direct result of Horizon's wrongful, deceptive, and unfair trade practices, Plaintiffs Medex and BioMatrix have been harmed and will continue to be harmed by Horizon's actions.

## COUNT XI

**PROMISSORY ESTOPPEL UNDER FLORIDA LAW**
(Medex and BioMatrix v. Horizon)

177.   Plaintiffs Medex and BioMatrix re-allege and incorporate as though fully set forth herein the allegations contained in paragraphs 1 through 91 of the Complaint.

178.   The Plan prepared by Horizon provides for reimbursement of claims for hemophilia treatment.  Horizon initially reimbursed the Plaintiffs for their submitted claims for valuable, covered, and medically necessary hemophilia treatment and entered into Letters of Agreement for the reimbursement of other claims.  Moreover, Plaintiff BiologicTx received coverage confirmations from Horizon, stating the Plan covered the Members' medically necessary hemophilia treatment.

179.   Plaintiffs Medex and BioMatrix justifiably relied on Horizon's representations that it would fully reimburse for the Members' hemophilia treatment.

180.   Horizon's representations that it would reimburse the Plaintiffs' claims were definite and substantial.

41

181.    After initially reimbursing the Plaintiffs' claims for hemophilia treatment, Horizon stopped reimbursing such claims on the basis that such treatment was excluded under the Plan.

182.    As a result of Horizon's actions, Plaintiffs Medex and BioMatrix have suffered harm caused by their reliance on the promises by Horizon, and such harm will continue if Horizon's promises are not fully enforced.

## COUNT XII

### TORTIOUS INTERFERENCE UNDER FLORIDA LAW
(Medex and BioMatrix v. Horizon)

183.    Plaintiffs Medex and BioMatrix allege and incorporate as though fully set forth herein the allegations contained in paragraphs 1 through 91 of the Complaint.

184.    The Plaintiffs have ongoing contractual and business relationships with each of its patients to whom they have provided treatment for hemophilia.

185.    Horizon knew and was fully aware of the Plaintiffs' relationships with their patients.

186.    Horizon intentionally committed multiple acts designed to interfere with and disrupt the Plaintiffs' relationships with their patients.

187.    Horizon intentionally interfered with the Plaintiffs' contractual relations with their patients by refusing to pay the claims of its Members.

188.    Horizon's acts have caused disruption and interference with the Plaintiffs' contractual and business relationships, including a decline in revenue and a loss of customers and goodwill.

189.    Horizon's actions have further caused harm to the public by making scarce medical treatment more costly to patients and threatening the availability of the treatment

Plaintiffs provide, as well as the existence of affordable care.  Horizon's actions have harmed and will continue to harm patients by further limiting their access to the Plaintiffs' specialized hemophilia treatment.

190.    Horizon's methods of interference are improper and unjustified, and its motives for interference are improper.

191.    Horizon's actions have interfered with the Plaintiffs' relationships with their patients.  As a result, Plaintiffs Medex and BioMatrix have suffered and will continue to suffer damages.

## COUNT XIII

### IMPLIED-IN-LAW CONTRACT/UNJUST ENRICHMENT UNDER FLORIDA COMMON LAW
(Medex v. Horizon)

192.    Plaintiff Medex re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 91 of the Complaint.

193.    Plaintiff Medex conferred direct benefits upon Horizon by providing valuable, covered and medically necessary hemophilia treatment to Horizon's Members through their established course of dealing as the party responsible for payment for this treatment.

194.    Horizon derived a direct benefit from Plaintiff Medex's provision of the hemophilia treatment for its participants because Plaintiff Medex provided the treatment at its own expense.  As a result of Plaintiff Medex's provision of treatment, Horizon fulfilled its obligations to the Members who pay premiums.

195.    Horizon voluntarily accepted, retained, and enjoyed the benefits conferred by the Plaintiff Medex, at Plaintiff Medex's expense, with the knowledge that the Plaintiff Medex expected to be paid the value of its services.

196.    Horizon failed to pay the value of Plaintiff Medex's health care services.  From November 2017 until the present, Horizon has denied Plaintiff Medex's submitted claims for hemophilia treatment.

197.    Horizon has retained the funds it would have otherwise reimbursed the Plaintiff Medex.  It would be inequitable for Horizon to retain these funds without paying the Plaintiff Medex for the medication and services it rendered to the Members.

198.    By failing to reimburse Plaintiff Medex for the treatment it rendered to Horizon's Members, Horizon has been unjustly enriched.

## COUNT XIV

**NEGLIGENT MISREPRESENTATION UNDER FLORIDA LAW**
(Medex v. Horizon)

199.    Plaintiff Medex re-alleges and incorporates as though fully set forth herein the allegations contained in paragraphs 1 through 91 of the Complaint.

200.    Despite the Plan's coverage of hemophilia treatment, prior reimbursements, Letters of Agreement and Plaintiff Medex's confirmation from Horizon such medications and services were covered under the Plan, Horizon now refuses to pay claims appropriately in accordance with the Plan documents and other representations it has made.

201.    At all times, Horizon, as the Plan fiduciary, owed a duty to its Members and providers dispensing hemophilia treatment to its Members, to administer the Plan in accordance with the Plan documents and other representations it has made.  Moreover, Horizon and its agents, employees, and representatives owe a duty to providers like Plaintiff Medex to reasonably and adequately investigate, maintain, and convey to providers accurate information relating to plan coverage, benefits and exclusions under the insurance policies they issue. Horizon specifically owed this duty to Plaintiff Medex, who contacted Horizon seeking

44

confirmation of coverage for the hemophilia medication and services it provided the Plan members.

202.   Plaintiff Medex reasonably expected and relied upon what it believed to be Horizon's honest representations that the hemophilia medications and services were covered under the Plan and Plaintiff Medex would be properly compensated in accordance with the Plan.

203.   By making such misrepresentations, Horizon breached its fiduciary duty to administer the Plan in accordance with the Plan documents and other representations it has made. It further breached its duty by failing to adequately investigate, maintain, and convey to Plaintiff Medex accurate information relating to the Plan's coverage.

204.   Horizon's material misrepresentation of coverage for medications and services was unknown to the Plaintiff at the time it agreed to provide medications and services to the Members.

205.   Plaintiff Medex reasonably expected and relied upon what it believed to be Horizon's honest representations that the Plaintiff Medex would be properly compensated in accordance with the Plan.

206.   Plaintiff Medex's reliance on these misrepresentations were to its substantial detriment and as a result, Plaintiff has been harmed and will continue to be harmed by Horizon's actions.

### **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in its favor and against Horizon and provide the following relief:

a)      Declaring that Horizon has violated the terms of the Plan;

b)      Declaring that Horizon has breached its fiduciary duty to the Plaintiffs;

c)     Declaring that by failing to comply with ERISA's timely claims procedure regulation, the Affordable Care Act's non-discrimination provision and the Americans with Disabilities Act, Horizon has violated ERISA;

d)     Enjoining Horizon from continuing to deny claims and require Horizon to participate, in good faith, in the Plan's appeals process;

e)     Ordering Horizon to pay the claims for treatment provided by the Plaintiffs;

f)     Ordering that Horizon pay to the Plaintiffs the amount to make the Plaintiffs whole for the harm suffered due to Horizon's breaches by providing other equitable relief, including but not limited to restitution and prejudgment interest;

g)     Awarding compensatory damages in an amount to be determined, in excess of $ 45,000,000.00, and punitive damages;

h)     Awarding treble damages due to Horizon's continued violations of the New Jersey Consumer Fraud Act (N.J.S.A. § 56:8-2 *et seq*.);

i)     Awarding the costs and disbursements of this action, including reasonable attorneys' fees due to Horizon's continued violations of ERISA and the New Jersey Consumer Fraud Act and FDUTPA (F.S.A. § 501.201 *et seq*.), and other costs and expenses in amounts to be determined by the Court;

j)     Awarding any other form of relief permitted by ERISA and the laws invoked in this action to address Horizon's actions; and

k)     Granting other and further relief, at law and equity, as the Court deems just, proper and appropriate.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs demand a jury trial for all claims so triable.

DATE:   July 20, 2018                    */s/ Ardith Bronson*
                                         Ardith Bronson (Fla. Bar No. 423025)
                                         **DLA Piper LLP (US)**
                                         200 South Biscayne Blvd., Suite 2500
                                         Miami, Florida 33131
                                         Tel:    (305) 423-8562
                                         Fax:    (305) 503-9583
                                         Email: *ardith.bronson@dlapiper.com*

                                         Brian H. Benjet (*pro hac vice* forthcoming)
                                         Nathan P. Heller (*pro hac vice* forthcoming*)*
                                         **DLA Piper LLP (US)**
                                         One Liberty Place
                                         1650 Market Street
                                         Suite 4900
                                         Philadelphia, PA  19103
                                         Tel.:   (215) 656-3300
                                         Fax:    (215) 656-3301
                                         Email: *brian.benjet@dlapiper.com*
                                                *nathan.heller@dlapiper.com*

                                         John J. Hamill (*pro hac vice* forthcoming)
                                         **DLA Piper LLP (US)**
                                         444 W. Lake Street, Suite 900
                                         Chicago, IL 60606
                                         Tel.:   (312) 368-7036
                                         Fax:    (312) 236-7516
                                         Email: *john.hamill@dlapiper.com*

                                         *Attorneys for BioMatrix Plaintiffs*