UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-61680-CIV-MORENO/SELTZER

BIOMATRIX SPECIALTY PHARMACY,
LLC FFP HOLDCO, LLC d/b/a MATRIX
HEALTH GROUP, BIOLOGICTX, LLC and
FFP ACQUISITION II, LLC d/b/a MEDEX
BIOCARE,

    Plaintiffs,

vs.

HORIZON HEALTHCARE SERVICES, INC.,
d/b/a HORIZON BLUE CROSS BLUE
SHIELD OF NEW JERSEY,

    Defendant.
_____/

## ORDER

**THIS CAUSE** has come before the Court upon Horizon Healthcare Services, Inc.'s Amended Motion to Disqualify DLA Piper [DE 42] as counsel for Plaintiffs in this matter. This case has been referred by the District Court to the undersigned for all pretrial proceedings [DE 20]. Pursuant to 28 U.S.C. § 636(b) and Rule 1(c), Magistrate Judge Rules of the United States District Court for the Southern District of Florida, the undersigned has reviewed the parties' motions, memoranda of law, exhibits, and affidavits, and has conducted an evidentiary hearing. The Court has also considered the argument of counsel and all applicable laws. The matter is now ripe for consideration.[1]

---

[1] "An order on the disqualification of counsel is a non-case dispositive matter that may be handled by a magistrate judge as a pretrial duty under 28 U.S.C. § 636(b)(1)(A)." Woliner v. Sofronsky, 2018 WL 4039311, at *1, n.1 (S.D. Fla. Aug. 23, 2018) (citations omitted) (Matthewman, M.J.).

1

I.   BACKGROUND

Plaintiffs BioMatrix Specialty Pharmacy, LLC, FFP Holdings, LLC d/b/a Matrix Health Group, BiologicTx, LLC, and FFP Acquisition II, LLC d/b/a Medex BioCare (collectively, "BioMatrix Plaintiffs" or "Plaintiffs") are specialty pharmaceutical companies that provide drugs to treat medical conditions such as hemophilia. BioMatrix Specialty Pharmacy wholly owns the subsidiaries that are parties to this action. Defendant, Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon" or "Defendant"), is a not-for-profit health services corporation organized under the laws of the State of New Jersey.

On July 20, 2018, the BioMatrix Plaintiffs filed a Complaint [DE 1] on behalf of themselves and as assignees of select Horizon policy members, alleging that Horizon wrongfully denied payment of claims for certain hemophilia medications and services. The Complaint seeks relief and damages under the Employee Income Retirement Security Act of 1974, as amended ("ERISA"), as well as under Florida and New Jersey statutory and common law. Horizon filed a Motion to Disqualify Counsel [DE 29] as well as an Amended Motion to Disqualify [DE 42] that requests an evidentiary hearing but is otherwise identical to the original motion.[2]  DLA Piper retained counsel and filed an opposition memorandum on November 27, 2018 [DE 45].  Horizon filed its reply memorandum [DE 46] on December 4, 2018. The Court held an evidentiary hearing on December 7, 2018.

---

[2] Horizon has also filed a Motion to Dismiss [DE 24] and a Motion to Change Venue [DE 34].  The undersigned has tolled briefing of those motions pending resolution of the Motion to Disqualify.

II. THE RESPECTIVE ARGUMENTS

    A. Horizon's Argument for Disqualification

Horizon argues that DLA Piper should be disqualified from serving as Plaintiffs' counsel because (1) Horizon had a long-standing and existing attorney-client relationship with DLA Piper at the same time that Plaintiffs engaged DLA Piper to represent them to address the precise issues in this lawsuit; and (2) many of the previous matters that DLA Piper previously litigated on behalf of Horizon involved issues that were substantially related to those now being litigated by DLA Piper against Horizon in this case.

According to Horizon, DLA Piper represented Horizon for over a decade in more than 30 cases, including several ERISA benefits cases. In December 2017, Horizon's outside lawyer at DLA Piper sent an e-mail to Horizon's Deputy General Counsel on behalf of another DLA Piper client, asking for help in restoring the lines of communication between Horizon and BiologicTx, in order to resolve unpaid claims submitted by BiologicTx. That e-mail prompted a telephone call between one of Horizon's in-house lawyers and the DLA Piper partner in which they discussed the unpaid claims sought by BiologicTx. The relationship between DLA Piper and Horizon ended in May 2018 and, two months later, DLA Piper filed this litigation on behalf of BioMatrix Plaintiffs and against Horizon seeking payment for those same claims that had been discussed in December 2017.

Horizon argues that the telephone call between the DLA Piper partner and Horizon's in-house lawyer violated Rule 4-1.7(a), R. Regulation Fla. Bar, which prohibits a lawyer or law firm from representing a client if "the representation of one client will be directly adverse to another client." Additionally, Horizon argues that even if DLA Piper were found to have properly terminated its attorney-client relationship with Horizon before filing the

instant lawsuit, its representation of the BioMatrix Plaintiffs in this case violates Rule 4-1.9(a), R. Regulating Fla. Bar, which prohibits a lawyer or law firm from representing "another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent."

B. DLA Piper's Argument Against Disqualification

DLA Piper argues that it was not engaged to represent BioMatrix on matters adverse to Horizon at any time while DLA Piper was representing Horizon and, thus, did not violate Rule 4-1.7(a). Indeed, DLA Piper points out that BioMatrix had retained the law firm of Broad and Cassel prior to May 2018 to represent it in its claims dispute with Horizon. DLA Piper characterizes the December 2017 telephone call by its Horizon relationship partner as a "professional courtesy" that did not rise to the level of legal representation on behalf of BioMatrix and denies that any confidential information was exchanged during the call.

DLA Piper also asserts that the issues in this lawsuit are not "substantially related" to the issues in the prior cases in which it represented Horizon and that Rule 4-1.9(a) is therefore not implicated. Horizon had denied BioMatrix's claims because it did not find the plan's sponsor to be a legitimate "small employer," but rather a fraudulent entity created by the BioMatrix Plaintiffs to "funnel windfall profits" to them. DLA Piper argues that none of the prior cases it handled for Horizon involved the same employer group or any dispute about the validity of a small employer group. Furthermore, DLA Piper argues that nothing in the present case would involve DLA Piper "attacking [any] work that the [firm] performed for the former client," – here, Horizon – and, thus, the "substantially related" standard is not breached.

4

Finally, DLA Piper argues that even if a conflict were found to exist, the balance of interests between Horizon and the BioMatrix Plaintiffs militates against disqualification. DLA Piper asserts that disqualification would cause Plaintiffs significant financial harm. DLA Piper has considerable knowledge of the BioMatrix Plaintiffs' business practices and is currently representing BioMatrix in another matter involving the same issues as the present case, albeit against a different insurer. Thus, DLA Piper argues that the BioMatrix Plaintiffs would incur substantial expenses were new counsel to re-learn what DLA Piper already knows; they would also incur duplicative fees in having two law firms represent them in two similar cases. By contrast, according to DLA Piper, Horizon would be unable to show any prejudice resulting from DLA Piper's remaining in this case.

### III.     EVIDENTIARY HEARING

The Court held an evidentiary hearing on December 7, 2018. Horizon called its Assistant General Counsel, Evan Neadel, and a former DLA partner, Andrew Bunn. DLA Piper did not call any witnesses. Horizon and DLA Piper both introduced exhibits [DE 48]. In addition, both parties submitted several affidavits in support of their respective positions. The evidentiary hearing focused on three issues: (1) whether DLA Piper represented BioMatrix adversely to Horizon in December 2017; (2) whether DLA Piper or Horizon initiated the termination of their relationship in May 2018; and (3) whether the current case is substantially related to prior work performed by DLA Piper for Horizon.

#### A.     Findings of Fact

Evan Neadel ("Neadel") began working at Horizon in 2016. Andrew Bunn ("Bunn") is a former partner at DLA Piper's northern New Jersey offices. Bunn and John Pendleton, Jr. ("Pendleton") served as relationship partners for DLA Piper and Horizon. Over the

5

years, DLA Piper represented Horizon in at least six ERISA healthcare claim cases and provided advice on issues relating to the denial of ERISA-benefits claims, claims processing, evaluations, appeals, the availability and exhaustion of administrative remedies, and the enforcement of anti-assignment clauses, including the same anti-assignment clause at issue in the instant litigation.  Bunn left DLA Piper in May 2018 to take a position as Associate General Counsel at BDO USA, LLP.

1. DLA Piper's Representation of BioMatrix and Horizon

DLA Piper represented Horizon on various matters from November 18, 2010, to May 7, 2018.  DLA Piper attorneys Pendleton and Bunn were the firm's relationship partners for Horizon.  DLA Piper has also served as BioMatrix's "principal outside counsel for transactional and regulatory matters" since late 2016.  DLA Piper attorney Joshua Kaye ("Kaye") is the firm's relationship partner for BioMatrix.

In December 2017, Morgan Harber ("Harber"), BioMatrix's Chief Compliance Officer and Corporate Counsel, called Kaye and told him that a BioMatrix affiliate, BiologicTx, had a large account receivable with Horizon and was having difficulty determining who it should contact at Horizon to resolve the matter.  In fact, on November 13, 2017, Horizon had advised BiologicTx's Florida counsel that its claims were being denied.  Kaye knew that Bunn had a relationship with Horizon and therefore reached out to Bunn for assistance.  According to Kaye's affidavit, he advised Harber that DLA Piper could not be adverse to Horizon and that the firm's role would be limited to identifying a business person at Horizon with whom Harber could speak [DE 45-4].  Neither Harber nor Kaye testified at the evidentiary hearing.

On December 14, 2017, Zenola Harper ("Harper"), then Horizon's Deputy General Counsel of Litigation, Labor and Employment, received an e-mail from Bunn [Joint Ex. 14]. The e-mail's subject line stated: "[External] Biologix/Horizon." The body of the e-mail is set forth in its entirety here:

> Hi Zenola:
>
> A client of our firm is a fund that has invested in a specialty pharmacy company called Biologix Tx. I was asked to reach out to Horizon because Biologix Tx is having trouble communicating with Horizon about some outstanding claims. Prior to November 21, 2017, Biologix Tx had been in communication with DaVonne Weathers, Manager, Service Operations, Tracey Barral Team Leader, Bluecard, and Scott Johnson, Special Investigative Unit. Apparently, those communications have ceased.
>
> Biologix Tx reports that the amounts at issue are Outstanding AR for Biologix Tx: $10,744,662.33; Medex: $1,920,987.94; Medex secondary: $213,490.77.
>
> Can you please put me in touch with someone at the Company to help restore the lines of communication?
>
> Many thanks. – Andy

Bunn's e-mail found its way to Neadel, who called Bunn on December 17, 2017. Neadel testified that he believed that DLA Piper represented a hedge fund that had invested in BiologicTx. At the time of that conversation, Neadel understood Bunn to be Horizon's outside counsel. Neadel did not know that DLA Piper represented BioMatrix and, in fact, he did not learn that DLA Piper had been representing BioMatrix for more than a year in separate litigation until it was disclosed in an affidavit filed by DLA Piper in this matter. Based on the December 14, 2017, e-mail to Harper, Neadel understood Bunn to be acting as an intermediary of a different client – a hedge fund – of DLA Piper.

7

Bunn also testified at the hearing. The Court finds his testimony to be credible. Bunn did not believe he was acting as an attorney for any party when he sent the e-mail to Harper or when he spoke to Neadel. He had been asked by another partner to reach out to Horizon to help restore lines of communication between BiologicTx and Horizon. Bunn had received many similar requests during the years he represented Horizon. Bunn stated that lawyers for healthcare providers had often asked him to connect them with people at Horizon for purposes of discussing payment issues, and he made those connections as a professional courtesy. Bunn considered Kaye's request and the December 2017 communications with Horizon to be no different.

Before sending the e-mail to Horizon, Bunn sought out and obtained information about the amounts claimed by BiologicTx so that he could provide sufficient information for Horizon to identify the matter. There is no evidence that Bunn was aware that Horizon had denied the claims made by BiologicTx. The information provided to Bunn was that BiologicTx had an open account receivable with Horizon. Bunn could not recall where he obtained the information that DLA Piper represented a fund that had invested in BiologicTx; he could only say that it must have been provided to him because he otherwise would not have included that information in his e-mail to Harper.

According to Neadel, Bunn's e-mail circulated around Horizon for a few days before it landed on his desk for a response. Before responding to Bunn, Neadel spoke to Harper and learned that BiologicTx's claims had been denied and the reasons for the denial. Because Neadel wanted Horizon's outside lawyer (Bunn) to know that Horizon had a legitimate reason for denying BiologicTx's claims, he disclosed to Bunn that Horizon believed Physician Health Group ("PHG") to be a fraudulent group. Neadel further

disclosed to Bunn that Horizon believed the PHG employees were actually employees of BioMatrix and that BioMatrix created this small group, which included many hemophiliacs, for the purpose of keeping its experience rating down. Moreover, Neadel testified that he made these disclosures to Bunn because Bunn was Horizon's outside attorney and that he would not have done so had he known that DLA Piper also represented BioMatrix.

Bunn testified that he did not recall receiving any confidential information from Neadel during the telephone call. Bunn recalled that Neadel told him that the claims arose from a small employer group called Pacific Health Group (PHG); that Horizon's Special Investigative Unit had investigated the group and, as a result, PHG was no longer considered a small employer group; and that Scott Johnson of Horizon's SIU was the person who had previously spoken to BiologicTx about the matter, and he was still the correct contact person for the company [DE 45-1]. Bunn testified that he conveyed that information to Kaye. Bunn did not recall any other substance of the conversation with Naedel.

2. The Termination of the Relationship Between DLA Piper and Horizon

In February 2018, BioMatrix engaged DLA Piper to defend a case filed by Highmark, Inc., in the Eastern District of Pennsylvania. The Highmark case involves virtually the same legal and factual issues as the instant litigation. Sometime in early 2018, Harber asked Kaye about the possibility of DLA Piper representing BioMatrix in pursuing claims against Horizon. Kaye advised Harber that DLA Piper had an ongoing relationship with Horizon and could not take on representation of BioMatrix in the matter. Horizon was represented by the Florida firm of Broad and Cassel at the time and, in fact, Broad and

Cassel had written to Horizon on January 25, 2018, in an effort to resolve the claims issues, but promised litigation if the matter was not resolved.

Over the years, the number of Horizon matters handled by DLA Piper decreased, and by 2018 only two matters remained open. One was a 2008 matter in New Jersey, <u>Edwards v. Horizon Blue Cross Blue Shield of New Jersey</u>, Civil Action No. 08-6160 (KM) (MAH). Horizon and DLA Piper disagree on which party initiated the withdrawal of DLA Piper from the litigation. DLA Piper introduced correspondence in which attorney Pendleton stated he was withdrawing at the direction of Horizon. [Joint Ex. 20]. And Horizon introduced an e-mail in which Pendleton claimed he had a conflict and asked permission not to attend a hearing on settlement approval. [Joint Ex. 17]. According to Neadel, the relationship between the attorneys on the <u>Edwards</u> case had deteriorated to such an extent that Horizon also retained the Greenberg Traurig firm to pursue settlement negotiations on its behalf. To accommodate Pendleton's request to be excused from attending the hearing on settlement approval, Horizon gave him permission to withdraw from the case. DLA Piper withdrew from that case on March 13, 2018, which left DLA Piper with only one remaining Horizon matter.

In April 2018, Bunn advised Horizon that he would be leaving DLA Piper in May to take an in-house position at a large accounting firm. At the time, DLA Piper was jointly representing Horizon and co-defendant Magellan Health Services, Inc., in <u>Libock v. Horizon Healthcare Services, Inc. et al.</u>, (D.N.J). According to Neadel, Magellan was paying for the defense of the case and, after Bunn's departure, it determined that Pendelton's hourly rate would be too high. At Magellen's behest, the defense of the case was transferred to the

firm of Epstein, Becker & Green. After Bunn's departure in May 2018, DLA Piper no longer represented Horizon.

Although DLA Piper had initially declined to represent DLA Piper in this case because of its concurrent relationship with Horizon, that conflict no longer existed as of May 2018. Kaye contacted BioMatrix in early May 2018 and advised that the firm was no longer representing Horizon. On July 20, 2018, DLA Piper filed the present case on behalf of BioMatrix against Horizon, seeking payment of the same claims that were the subject of Bunn's December 2017 communications with Horizon.

### 3. The Nature of Work Performed by DLA Piper for Horizon

DLA Piper maintained a long-term relationship with Horizon through which it represented Horizon in multiple cases involving claims for benefits under ERISA. These cases involved knowledge of Horizon's claims handling and appeals procedures. Bunn testified that he authored briefs and memoranda that detailed Horizon's administrative procedures. DLA Piper defended Horizon's anti-assignment clauses, including the anti-assignment clause at issue in this case. DLA Piper, however, did not represent Horizon in any matter involving the validity of a small employer group.

## IV. DISCUSSION

"Disqualification of a party's chosen counsel is an extraordinary remedy not generally in the public interest – a remedy that should be employed only sparingly." Woliner v. Sofronsky, 2018 WL 4039311, at *5 (S.D. Fla. Aug. 23, 2018) (quoting First Impressions Design & Mgmt. Inc. v. All That Style Interiors, Inc., 122 F. Supp. 2d 1352, 1354-55 (S.D. Fla. 2000)). "A court 'must take care to preserve the delicate balance between a party's right to retain the counsel of his choice and the need to ensure

adherence to the highest ethical standards for professional responsibility.'" General Cigar Holdings, Inc. v. Altadis, S.A., 144 F. Supp. 2d 1334, 1337 (S.D. Fla. 2001) (quoting Fisons Corp. v. Atochem North America, Inc., 1990 WL 180551, at *2 (S.D.N.Y. Nov. 14, 1990)).

"When a motion to disqualify is based on an allegation of ethical violation, the court may not simply rely on a general inherent power to admit and suspend attorneys, without any limit on such power." Jeudine v. City of Homestead, Florida, 2016 WL 913261, at *3 (S.D. Fla. Mar. 9, 2016) (quoting Suchite v. Kleppin, 784 F. Supp. 2d 1343, 1344 (S.D. Fla. 2011)). "The court must clearly identify a specific Rule of Professional Conduct which is applicable to the relevant jurisdiction and must conclude that the attorney violated that rule in order to disqualify that attorney." Suchite, 784 F. Supp. 2d at 1344. "An order involving the disqualification of counsel must be tested against the standards imposed by the [Florida Bar] Rules of Professional Conduct." Id. at 1346 (quoting Estright v. Bay Point Improvement Ass'n, Inc., 921 So.2d 810, 811 (Fla. 1st DCA 2006)).

A.  Florida Bar Rule 4-1.7(a)

**RULE 4-1.7 CONFLICT OF INTEREST; CURRENT CLIENTS**

(a) Representing Adverse Interests. Except as provided in subdivision (b), a lawyer must not represent a client if:

(1) the representation of 1 client will be directly adverse to another client; or

(2) there is a substantial risk that the representation of 1 or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

> (b) Informed Consent. Notwithstanding the existence of a conflict of interest under subdivision (a), a lawyer may represent a client if:
>
>> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>>
>> (2) the representation is not prohibited by law;
>>
>> (3) the representation does not involve the assertion of a position adverse to another client when the lawyer represents both clients in the same proceeding before a tribunal; and
>>
>> (4) each affected client gives informed consent, confirmed in writing or clearly stated on the record at a hearing.

"The standard for disqualifying lawyers because of concurrent representation is more strict than the standard for adverse representation of a former client." General Cigar, 144 F. Supp. 2d at 1337 (citing Florida Ins. Guar. Assn., Inc. v. Carey Canada, Inc., 749 F. Supp. 255, 260 (S.D. Fla. 1990)). "Where attorneys have undertaken representation that is adverse to a current client, the conduct of the attorneys undertaking the concurrent representation must be measured against the duty of undivided loyalty to each of the attorneys' clients." General Cigar, 144 F. Supp. 2d at 1338. "When the representation is concurrent . . . adverse representation is prima facie improper." Id. at 1337 (citing Cinema 5 Ltd. v. Cinerama, Inc., 528 F.2d 1384, 1387 (2d Cir. 1976).

Thus, the question before the Court is whether DLA Piper undertook representation adverse to Horizon in connection with BiologicTx's unpaid claims while it still represented Horizon. DLA Piper characterizes its efforts as a professional courtesy that did not rise to the level of legal representation. The Court disagrees. Notwithstanding the very decent

13

motives of the DLA Piper relationship partner when contacting Horizon, his subjective intentions do not govern the analysis. It is undisputed that in December 2017 different offices of DLA Piper represented both Horizon and BiologicTx. Although Broad and Cassel had been representing BiologicTx in pursuing its claims against Horizon, BiologicTx asked its DLA Piper relationship partner for assistance when those claims were denied. Knowing that his partner Bunn represented Horizon, the Biologic relationship partner reached out to Bunn.

Several factors compel the Court to conclude that DLA Piper did, in fact, represent BiologicTx in December 2017 on a matter that was directly adverse to Horizon. First, the "open accounts receivable" that Bunn called about were claims that had actually been denied by Horizon. This was not a matter of payments being delinquent or possibly overlooked. In November 2017, Horizon's SIU notified BiologicTx that the claims were being denied. [Joint Ex. 18 and 19]. Thus, at the time Harber reached out to DLA Piper for assistance, BiologicTx and Horizon already were entailed in a bona fide dispute. The call made to DLA Piper by BiologicTx was not neutral; the intent of the call was to help it recover payments that had been denied. Indeed, BiologicTx's efforts to enlist Horizon's own attorneys – DLA Piper – to collect a previously denied claim resulted in Neadel's disclosure to Bunn in confidence Horizon's reasons for denying the claims. Second, it appears that certain material facts were not disclosed to Bunn. Bunn was unaware of the nature of DLA Piper's relationship with BiologicTx; he believed that the inquiry was being made on behalf of a purported hedge fund client of DLA Piper. Furthermore, he did not know that the amount sought had previously been denied by Horizon (as opposed to being merely open accounts receivable). Without providing this information to Bunn, DLA Piper

effectively leveraged its relationship with Horizon for the benefit of BiologicTx. Likewise, that BiologicTx sought DLA Piper's assistance on the denied claims even while a different law firm was representing it in the matter was a transparent effort to capitalize on DLA Piper's relationship with Horizon. For these reasons, the Court finds that DLA Piper did not act with "undivided loyalty" toward Horizon when it advanced BiologicTx's efforts to collect a previously denied claim. The Court, therefore, concludes that DLA Piper did represent BiologicTx in December 2017 and that the representation was adverse to Horizon in violation of Rule 4-1.7(a), Rules Regulation the Florida Bar.[3]

DLA Piper argues that even if a conflict were found to exist, disqualification is not mandatory. See Great Amer. Ins. Co. v. General Contractors & Constr. Mngmt., Inc., 2008 WL 1994857, at *1-2 (S.D. Fla. May 6, 2008) ("It is well-settled that disqualification is not mandatory even after a finding that a law firm has violated a conflict of interest rule."). DLA Piper argues that BiologicTx would suffer significant financial harm if the firm were to be disqualified by having to hire new counsel in this litigation and by having to pay

---

[3] Horizon argues that DLA Piper intentionally dropped it as a client in order to represent BioMatrix in this action, which is ethically prohibited. See Young v. Achenbauch, 136 So. 3d 575, 581 (Fla. 2014) ("Attorneys may not avoid this rule by taking on representation in which a conflict of interest already exists and then convert a current client into a former client by withdrawing from the client's case"). The Court, however, finds the dissolution of the attorney-client relationship in this instance to have been mutual. The decision to substitute counsel in the Libock case after Bunn's departure was made by Horizon's co-defendant, Magellan, not by DLA Piper. Additionally, DLA Piper's withdrawal from the Edwards case came just before the case settled, and the evidence presented established that the Greenberg Traurig firm had been retained to negotiate and memorialize the settlement. Thus, DLA Piper's involvement in that litigation was essentially finished by the time it withdrew. Furthermore, that withdrawal occurred before Bunn announced his departure from DLA Piper. Neither the timing nor the facts suggest a "hot potato" scenario. See Young v. Achenbauch, 136 So. 3d 575, 581 (Fla. 2014) (quoting ValuePart, Inc. v. Clements, 2006 WL 2252541, at *2 (N.D. Ill. Aug. 2, 2006)).

two separate law firms to represent it in two similar cases.  By contrast, it contends that Horizon has suffered minimal, if any, harm by DLA Piper's adverse representation.  The Court disagrees.

Disqualification is inherently costly to the client of the disqualified attorney.  Such costs include "the delay, inconvenience, and expense an innocent client may incur, as well as the deprivation of the innocent client's counsel of choice."  Id. at *1 (citing SWS Financial Fund A v. Salomon Bros., Inc., 790 F. Supp. 1392 (N.D. Ill. 1992)).  The Court, therefore, must consider whether disqualification is "a desirable sanction" in light of the purposes of the violated rule.  Id.  "The two basic purposes of Rule 4-1.7 are (1) to protect confidences that a client may have shared with his attorney and (2) to safeguard loyalty as a feature of the attorney-client relationship."  Id. at *1 (citing Prudential Ins. Co. of America v. Anodyne, Inc., 365 F. Supp. 2d 1232, 1236 (S.D. Fla. 2005)).  The Court has conducted that analysis and concludes that disqualification is warranted.

Several factors compel that conclusion. Horizon shared (what was at the time) confidential information about its decision to deny BiologicTx's claims with its DLA Piper attorney.  Neadel testified that he would not have provided that information had he known that DLA Piper was also representing BiologicTx.  Thus, the December 2017 phone call resulted in Horizon unwittingly disclosing its confidences about an adverse party to that adverse party's law firm – a conversation that clearly undermined loyalty as a feature of the attorney-client relationship.

Additionally, the topic discussed in the December 2017 telephone conversation was not merely an adverse issue; the conversation involved the very claims at issue in this litigation.  DLA Piper called Horizon on behalf of BiologicTx to discuss claims that Horizon

16

had previously denied. Those are the very claims that form the basis of the Complaint filed by DLA Piper against Horizon here. Again, the loyalty feature of the attorney-client relationship, from Horizon's perspective, is substantially harmed.

Other relevant factors in balancing the interests of disqualification include "the nature of the ethical violation; the prejudice to the parties; . . . the public's perception of the profession; and whether or not the attempt to disqualify an attorney is used as a tactical device or a means of harassment." Id. at *2. In this case, there is no evidence of the disqualification motion being a tactical device; Horizon has pursued the issue since the inception of the case and it filed the Motion to Disqualify early in the litigation. The case is not yet at issue. The Court finds the violation here strikes at the heart of an attorney's duty of loyalty to the client, thus harming not only Horizon's interests, but the public's perception of the profession as well. And, finally, the fact that BiologicTx had been represented by other counsel, yet nevertheless sought to leverage DLA Piper's relationship with Horizon, leads to the conclusion that any harm suffered by BiologicTx was, in part, occasioned by its own decision to seek assistance from DLA Piper when it knew that DLA Piper represented Horizon. For these reasons, the Court finds that the balance of interests weighs in favor of disqualifying DLA Piper.[4]

---

[4] DLA Piper submitted evidence that the lawyers who worked on Horizon matters are screened from this litigation. The Court notes that in Florida ethical screens cannot cure conflicts of interest. Edward J. DeBartolo Corp. v. Petrin, 516 So. 2d 6, 7 (Fla. 5th DCA 1987); Harris Corp. v. Ruckus Wireless, Inc., 2015 WL 12835681, at *2 (M.D. Fla. Jun. 10, 2015).

Given the Court's decision to disqualify on the basis of Rule 1-4.7(a), the Court will not consider the alleged violation of Rule 1-4.9(a), which precludes a lawyer from engaging in representation against a former client on matters that are substantially related.

For the reasons set forth in detail above, it is hereby

**ORDERED AND ADJUDGED** that Horizon's Amended Motion to Disqualify DLA Piper [DE 42] is **GRANTED**. Plaintiffs shall file a Substitution of Counsel no later than January 18, 2019. It is **FURTHER ORDERED** that Plaintiffs' responses to Horizon's Motion to Dismiss [DE 24] and Horizon's Motion to Change Venue [DE 34] shall be filed no later than February 4, 2019.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 27th day of December 2018.

BARRY S. SELTZER
United States Magistrate Judge

Copies furnished counsel via CM/ECF